MURTICE MATTHEWS a/k/a Ernestine Brown *v.*
STATE OF MARYLAND

[No. 42, September Term, 1974.]

*Decided October 14, 1974.*

The cause was argued before Orth, C. J., and Powers and
Gilbert, JJ.

*Allan P. Feigelson, Assigned Public Defender,* with whom
were *Powers & Feigelson* on the brief, for appellant.

*George A. Eichhorn, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Harry A. E. Taylor, Assistant Attorney General, Milton B. Allen, State's Attorney for Baltimore City* and *Sandra O'Connor, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

This appeal is primarily concerned with the duty of a trial judge to reveal to the parties that a witness, in an aside, related to the judge certain information exculpatory to the accused, and then testified to the contrary.

Murtice Matthews,[1] a self-confessed prostitute, was charged with the robbery with a dangerous and deadly weapon of Willie Reaves. At a jury trial in the Criminal Court of Baltimore, Reaves testified that at about 9:30 P.M. on November 14, 1972, he was waiting in his automobile at the intersection of Pressman Street and Pennsylvania Avenue for a traffic light to change. Suddenly, a woman, unknown to Reaves, entered his vehicle and asked him if he "wanted to do any business." According to Reaves he did not comprehend what was meant by that remark, but he, nevertheless, answered in the negative. Thereupon, the woman, Mrs. Matthews, placed a knife against Reaves's throat and instructed him to turn over his money to her. Reaves stated that he took his wallet, containing $21.46, from his pocket and surrendered it to Mrs Matthews. He was then ordered to drive his automobile, and while doing so he saw a police car. Reaves drove his vehicle in such a manner as to touch that of the police. He alighted and informed the police officer of the robbery. The officer went to the driver's side of the Reaves vehicle where the left front door was open and started to conduct a search. Finding nothing on the driver's side, the officer walked around to the passenger side. Mrs. Matthews, who had remained seated in the vehicle, then ran from the car. A short time later she was

---

1. The appellant has also been known by the name of Ernestine Brown, a factor that may have contributed to the delay in bringing her case to trial.

apprehended. There is testimony that Reaves's wallet was found on Mrs. Matthews. Money was found in the wallet, but the record is unclear whether the $21.46 was the only money found on her person when she was searched. There was further testimony that a penknife, which was closed, was found under the passenger side of the front seat.

Mrs. Matthews tells a different version of the incident. She states that she was plying her trade on the night of the incident, and that Reaves was a regular customer. Mrs. Matthews told the jury that she met Reaves every Friday night, for the preceeding four months, at the corner of Pressman Street and Pennsylvania Avenue. She would then go with him to his house or to her sister's residence for the purpose of engaging in sexual relations. On the night of the incident, giving rise to the charges against her, she was late for the assignation. When she finally entered Reaves's car she said, "Are you ready?" Reaves stated that he was, and they went to his house where he paid her $35.00 for her sexual services. Mrs. Matthews further testified that Reaves, after completion of the sex act, desired further intercourse. When she refused to submit to his wishes unless she was remunerated, he became angry, and an argument ensued. Mrs. Matthews started to leave, but Reaves told her that he would drive her to her home. During the ride Reaves asked her to hold the knife and his wallet. They stopped at a fish store and Reaves inquired as to whether Mrs. Matthews was hungry. She said that she was not. Reaves, however, entered the store, stayed for "about fifteen minutes" and then reentered the car. A police car approached, and Reaves got out of his car and talked to the officer. Mrs. Matthews said that she overheard Reaves say that he had been robbed by her, and for that reason she ran.

The jury obviously attached greater credibility to the testimony of Reaves, who thrice — twice during the case in chief and once during the rebuttal — denied knowing Mrs. Matthews or having ever seen her prior to the moment she entered his car on the night of the incident, because they found Mrs. Matthews guilty. Sentencing was deferred until November 13, 1973, approximately one month after trial. At

the time sentence was imposed the trial judge made the following significant remarks:

> ". . . The one thing in your favor is the fact that the prosecuting witness, Mr. Reaves, was a very reluctant witness for obvious reasons, and he told me either in Court or when I was upbraiding him for not coming back to Court to testify, he said he did not want to prosecute you. *He had known you previously,* and he was not in any fear that you would stick the knife in him. *He told me at the bench, I think, or I know he didn't tell you, he told me.* I believe I called him up to the bench after the first day when he had been late, and I let the jury go. I said, 'Mr. Reaves, I want you to be here tomorrow morning without fail,' and then he told me, 'Well, I wasn't really worried about it. She held the knife at me, but I didn't think she was going to cut me,' and indicated he did not want to prosecute. That is in Miss Matthews' favor." (Emphasis supplied).

We agree that Reaves's remarks to the trial judge are in Mrs. Matthews's favor, but we do so in a different context. Apparent on the face of the judge's above-quoted statement are two clear inferences, (1) Reaves was lying when he informed the judge that he had known Mrs. Matthews previously or (2) Reaves committed perjury in his testimony during the course of the trial. In either event we think the judge was duty-bound to reveal to the State and the accused, out of the presence of the jury, that the witness had told the judge facts that were diametrically opposite to those to which the witness testified. The disclosure by the judge should have been made prior to the conclusion of the evidence, and preferably prior to the conclusion of the witness's testimony.

In 48 C.J.S. *Judges* § 50 (1947) it is said:

> "A judge has the power and duty to take proper action to promote justice. . . ."

Also,

> "... Where a trial judge is convinced that a witness is testifying falsely on a material matter, he may order an investigation. ..."

In 47 Am.Jur.2d *Judges* § 21 (1969) it is stated in a different manner. That section reads:

> "The powers of a judge are those that are conferred upon him by the constitution and by statute and those that are inherent in his office. The duties of the office of judge include all those that fairly lie within its scope, those that are essential to the accomplishment of the main purposes for which the office was created, and those that, although incidental and collateral, are germane to or serve to promote or benefit the accomplishment of the principal purposes. All such duties are official, and the incumbent is obliged to perform them." (Footnote omitted).

The American Bar Association, Standards for Criminal Justice, "The Function of the Trial Judge" §1.1(a) (1972), declares:

> "The trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice. *The adversary nature of the proceedings does not relieve the trial judge of the obligation of raising on his own initiative, at all appropriate times and in an appropriate manner, matters which may significantly promote a just determination of the trial.* The only purpose of a criminal trial is to determine whether the prosecution has established the guilt of the accused as required by law, and the trial judge should not allow the proceedings to be used for any other purpose." (Emphasis supplied).

The obvious issue before the jury was the credibility of

Reaves as against that of the appellant, who now feels that she has been convicted on testimony that is "gloriously perjured." [2] Had the judge advised the parties of the disparity between Reaves's unsworn remarks to the judge and the sworn testimony of Reaves, counsel could have inquired by examination as to which of Reaves's two versions was truthful. The jury would have had the benefit, in assessing credibility, of the inculpatory and exculpatory statements. It might well be that they would have believed Reaves's sworn testimony rather than what he told the judge at the bench. On the other hand, the conflict in Reaves's [3] two separate and distinct versions may have led the jury to conclude that Reaves was not credible. In short, they might have followed the legal maxim, *Falsus in uno, falsus in omnibus*, and completely rejected Reaves's narratives.

We reiterate what we said in *Little v. Duncan*, 14 Md. App. 8, 15, 284 A. 2d 641 (1971) that:

> ". . . [I]t [is] incumbent upon the trial judge to take steps to assure a fair and impartial trial to the participants in the litigation."

*See also Fryson v. State*, 17 Md. App. 320, 301 A. 2d 211 (1973) and *Ferry v. Cicero*, 12 Md. App. 502, 280 A. 2d 37 (1971).

It may well be that the trial judge informed the parties of Reaves's inconsistent statement, but it is not so stated on the record. We, therefore, are obliged to hold that Mrs. Matthews was denied the fair and impartial trial to which she is entitled. [4]

Because this case must be retried, if the State so elects, we deem it advisable to comment on another issue posed to this

---

2. Horace, 65-8 B.C., from *Odes*, bk. III, ode XI, 1. 35.

3. We observe from the record that Reaves was, at the time of the trial, married and the father of two children. A public recitation of his previous relationship, if any, with the appellant could have been most embarrassing to him.

4. "There cannot be anything of greater consequence, than to keep the streams of justice clear and pure. . . ." Lord Hardwicke, L.C., Roach v. Garvan, 2 Atk. 469 (1742).

Court by Mrs. Matthews, *i.e.*, the alleged denial of a speedy trial. The principal thrust of appellant's argument relative to the denial of a speedy trial is directed toward the trial judge's alleged invocation of the "Demand-Waiver" doctrine. Our review of the record, however, fails to support appellant's position. The record reveals that Mrs. Matthews was arrested, for the instant offense, on November 14, 1972. She was released on bail December 6, 1972, but failed to appear in the Criminal Court on March 5, 1973. The bail bondsman surrendered Mrs. Matthews in open court on March 12, 1973. It appears from the record that Mrs. Matthews was on bail under another name at the same time that she was bailed in the instant offense. Her excuse for non-attendance on March 5, 1973 was that, "I didn't get a copy. ... Plus I was already in jail. They knew where I was at." Presumably, the sheriff could not notify Mrs. Matthews of the March 5, 1973 hearing date because she was in the Baltimore City Jail under an alias. On April 30, 1973 Mrs. Matthews filed a *pro se* motion for a speedy trial.[5] Subsequently, counsel filed a similar motion on August 30, 1973, two days after the scheduled trial date. The trial that was set for August 28, 1973 was postponed at the request of the State "for the reason that a prosecuting witness would be out of town on that date." In any event the case was tried within seven (7) months of appellant's pro se motion, and within twelve (12) months of her arrest. We do not think a delay of twelve months, under the circumstances of this case, reaches constitutional dimensions. We pointed out in *State v. Dubose*, 17 Md. App. 292, 301 A. 2d 32 (1973) where the delay is not of constitutional dimension, then "under the authority of *Barker* [*v. Wingo*, 407 U. S. 514, 92 S. Ct. 2182, 33 L.Ed.2d 101 (1972)] 'there is no necessity for inquiry into the other factors [6] that go into the balance.' 407 U. S. at 530."

---

**5.** Appellant's motion was filed in letter form. The return address indicates she was then confined in the Maryland Correctional Institution for Women, Jessup, Maryland. Her confinement in Jessup was the result of a conviction on March 22, 1973 for "soliciting".

**6.** The four factors are: (1) length of delay; (2) reason for the delay; (3) prejudice to the accused; and (4) waiver by the accused.

Even if we assume, *arguendo*, that the delay in the instant case crossed the threshold of constitutional dimensions, we would still conclude, on the basis of our independent constitutionally mandated review of the record, that Mrs. Matthews's Sixth Amendment right to a speedy trial has not been abridged.

Four months of the delay is directly attributable to the confusion occasioned by Mrs. Matthews's prior arrest and use of an alias. Two and one-half months of the delay was caused by the absence of a prosecuting witness and is, at most, a "neutral" reason under *Barker v. Wingo, supra.* At least one-half month was due to the appellant's discovery motion. That time is also chargeable to appellant. The remaining five month portion of the delay is chargeable in part to the State. Five months is not, as we see it, so substantial as to require the invocation of constitutional sanction in the form of dismissal of the indictment.

The argument made to the trial judge as to why he should dismiss the indictment for want of a speedy trial was limited to the allegation that the delay prejudiced Mrs. Matthews. The "prejudice" to which appellant alluded was that she was denied the *possibility* of parole because of the pending charges. As we read *Barker v. Wingo, supra,* the "prejudice" to which the Supreme Court refers is prejudice to the defense in the form of: (1) oppressive pretrial incarceration; causing (2) excessive anxiety and concern to the accused; and (3) impairment of the defense of the case, which includes such matters as lost witnesses, lost records and documents, and dimming memories. *See State v. Jones*, 18 Md. App. 11, 305 A. 2d 177 (1973). Although courts have been cautioned not to "overlook the possible impact pending charges might have on . . . prospects for parole and meaningful rehabilitation", *Moore v. Arizona*, 414 U. S. 25, 94 S. Ct. 188, 38 L.Ed.2d 183 (1973), there is nothing in the record to demonstrate that Mrs. Matthews would have been paroled even if the instant case had not been pending. Her "record" prior to this case consisted of three "soliciting" offenses in addition to shoplifting and narcotics violations. We think appellant's motion to dismiss for lack of a speedy trial was properly denied.

In view of the disposition made in this appeal, it is unnecessary for us to consider the appellant's third contention.

*Judgment reversed.*
*Case remanded for a new trial.*