BERNARD JEROME LEE *v.* STATE OF MARYLAND

[No. 1244, September Term, 1975.]

*Decided September 16, 1976.*

The cause was submitted on briefs to ▆▆GILBERT, MEN-CHINE and MOORE, JJ.

Submitted by *Gerald A. Kroop* for appellant.

Submitted by *Francis B. Burch, Attorney General, Bruce C. Spizler, Assistant Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *John Denholm, Assistant State's Attorney for Baltimore City,* for appellee.

MENCHINE, J., delivered the opinion of the Court.

Bernard Jerome Lee was convicted of distribution of heroin in a non-jury trial in the Criminal Court of Baltimore upon submission to the court under a statement of facts. He was sentenced to fine and imprisonment. He thus states the issues on appeal:

1. The trial court erred by denying the appellant's motion to dismiss the addendum.
2. The appellant was denied a speedy trial with respect to both the main offense and the addendum.

### The Addendum

The record shows that although an addendum was filed by the State on May 1, 1975, no trial upon the issue whether the appellant was a second offender was ever had. At arraignment and trial no reference was made to the addendum. The sentence imposed upon the appellant, again without reference to an addendum, was less than the maximum authorized for a first offense. In such circumstances we perceive no appellate issue relating to the addendum.

### Speedy Trial

On December 10, 1973, the appellant was indicted on a charge of distribution of heroin. He had been arrested the previous day. He was released on bail on December 13, 1973.

The record shows that although a panel attorney was appointed for the accused by the office of the district public defender,[1] two experienced private counsel on January 16, 1974,[2] jointly filed a series of motions bearing the following descriptive titles:

1. Motion for a Bill of Particulars.
2. Motion for discovery and inspection with respect to electronic interception or eavesdropping.
3. Motion to compel All State's witnesses to submit to polygraph tests.
4. Motion for production of exculpatory information.
5. Motion to interview State's witnesses.
6. Motion for discovery and inspection.

Answers to those motions were filed by the State on June 12, 1974. Hearings on all motions were had on June 12, 1974, but held *sub curia.* No decision upon them by that hearing judge ever thereafter was made. The last docket entry of June 12, 1974, consists of the notation "Reset for trial 28 June 1974." The record shows that the State was ready for trial at that time but the appellant declared he could not proceed in the absence of rulings upon his several motions. We think he was entirely justified in taking that position. On June 19, 1974, counsel for the appellant filed memoranda of law in support of the motion for particulars and the motion for production of exculpatory information.

---

1. His appearance was stricken on June 12, 1974. Court proceedings on that date show the following:

"There has been some confusion in this case with regards to counsel; apparently there is another Bernard Lee. Hilary Caplan's appearance appears in this case. As a matter of fact, Mr. Kroop or I never received notice from Criminal Assignment. He did receive it from Mr. Murphy. We would move to enter the appearance of Mr. Kroop and myself for the defendant. I go on proper Motion that Mr. Caplan's name be removed from the file. Mr. Kroop and I do represent Mr. Lee and I think the record and the file should reflect that, so we do get proper notice in the future.

"THE COURT: Yes. I will instruct the Clerk to make sure that is accomplished. The computer print out does indicate Mr. Hilary Caplan as the Attorney of record."

2. The names of private counsel were not placed upon the docket until the entry of their formal appearances on June 12, 1974.

Except for a cryptic entry on April 16, 1975, "Pursuant to the motion for discovery and inspection filed," [3] the docket entries reflect no further action in the case until May 19, 1975, when hearings on preliminary motions were rescheduled before a second judge. All motions were disposed of on May 20 and 22, 1975. Trial was commenced on July 21, 1975.

In *Barker v. Wingo,* 407 U. S. 514, 33 L.Ed.2d 101, 92 S. Ct. 2182 (1972), the Supreme Court of the United States rejected inflexible approaches to a determination whether the constitutional right to a speedy trial has been abridged. Instead, after announcing that "... any inquiry into a speedy trial claim necessitates a functional analysis of the right in a particular context of the case ...," *(Baker* at 522, [112], [2188]), the Supreme Court declared: "The approach we accept is a balancing test, in which the conduct of both the prosecution and the defendant are weighed." *(Barker* at 530, [116], [2191-92]).

The Supreme Court then discussed the application of such a test, saying at 530, [116-17], [2192]:

> "A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."

The trial judge denied the motion to dismiss the indictment. The Court of Appeals in *Epps v. State,* 276 Md. 96, 109, 345 A. 2d 62, 71 (1975), thus succinctly stated the course to be followed in appellate review following rejection of such a motion by the trial court:

> "In making our independent constitutional appraisal of whether the appellant was denied his

---

3. No document bearing that date is to be found in the record.

constitutional right to a speedy trial we must under the holding in *Barker v. Wingo* 'engage in a difficult and sensitive balancing process' in which 'the conduct of both the prosecution and the defendant are weighed' and 'considered together with such other circumstances as may be relevant' the four enumerated and related factors. 407 U. S. at 533. Realizing that *Barker* 'prescribes "flexible" standards based on practical considerations,' *Strunk v. United States, supra,* at 438, and that the 'right to a speedy trial is not a theoretical or abstract one but one rooted in hard reality in the need to have [the] charges promptly exposed' *Dickey v. Florida,* 398 U. S. 30, 37 (1970), we must determine whether the State did 'discharge its "constitutional duty to make a diligent, good-faith effort to bring [Epps] [to trial]".' *Moore v. Arizona, supra,* at 26; *Smith v. Hooey, supra,* at 383."

We shall, accordingly, examine the record, utilizing the balancing test factors set forth in *Barker v. Wingo, supra.*

### Length of Delay

In *Barker v. Wingo, supra,* the Supreme Court had said at 530-31, [117], [2192]:

"The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case."

The skeletal dates are these:

| | | |
|---|---|---|
| Arrest | : | December 9, 1973 |
| Indictment | : | December 10, 1973 |
| Trial | : | July 21, 1975. |

The full period of time intervening between arrest and trial was nineteen months. Such a delay in and of itself does not demonstrate a violation of the Sixth Amendment's guarantee of a speedy trial. *United States v. Ewell,* 383 U. S. 116, 120, 15 L.Ed.2d 627, 630, 86 S. Ct. 773, 776 (1966).

As will be explained in our discussion of the "reason for delay" we do not find this entire time period to constitute the critical period of delay.

In any case, we are persuaded that the length of delay is such as to trigger a necessity for careful consideration of all factors of the balancing process.

### Reason for Delay

Our examination of the record shows not the slightest indication that the delay was occasioned by a deliberate attempt to delay the trial in order to hamper the defense. The delay in the subject case, having stemmed from more neutral causes, should not be weighted as heavily against the State. *Barker v. Wingo, supra,* at 531, [117], [2192].

The period of delay breaks down into two separate segments, namely: (a) from arrest, December 9, 1973 to hearing upon motions, June 12, 1974 and (b) from June 12, 1974 to trial date, July 21, 1975. We find it necessary separately to examine the reasons for delay as to the two periods.

### December 10, 1973 to June 12, 1974

Mindful of the admonition that "A defendant has no duty to bring himself to trial," (*Barker v. Wingo, supra,* at 527, [115], [2190]), we believe that this period of delay — standing alone — would not, in the circumstances of this case, have triggered a necessity for further consideration of the other factors of the "balancing test."

We find nothing in the record to indicate other than "neutral reasons" for this segment of the delay and do not consider its length to be beyond reasonable bounds under the facts of this case.

*June 12, 1974 to July 21, 1975*

Shortly after the scheduled hearing (June 12, 1974) upon pre-trial motions, at which the issues had been held *sub curia*, the hearing judge was appointed administrative judge and found himself unable to continue to act in the case. At that point the case was sent back to the criminal assignment office. No reassignment of the case occurred until pending motions were heard and decided on May 19, 20 and 22, 1975.

The initial hearing judge had directed the State to cause transcripts of certain eavesdrop tapes to be prepared and submitted to the court by June 26, 1974. The State acknowledged that eavesdrop tapes had been made, but announced that its sole reliance would be upon named eyewitnesses, and that the tapes would not be used at trial. Nonetheless the hearing judge ordered that the tapes be prepared and submitted to him for *in camera* inspection. They were not submitted to the court until "early 1975." The only explanation by the State for that delay was that the police officer assigned to accomplish the transcription "was transferred from the Narcotics Strike Force to the Northeastern District in the late summer of 1974." We find that the explanation fails to justify the tardy reassignment of the cause on May 19, 1975. There was testimony, to be sure, by the initially assigned assistant State's attorney, whose responsibility for the case ended with his appointment as Deputy State's Attorney, that tends to mitigate to some degree the blame attaching to the State. He testified as follows:

> "Q Did Mr. Cardin or Mr. Kroop demand of you that they wanted this case to be set in for trial?
>
> A Did they demand that a trial date be set?
>
> Q Yes, sir.
>
> A I can't recall that, because they had their Motions outstanding. They wanted those disposed of.
>
> Q Had there ever been a mention to you since June

12th of possibly stetting this case at any period of
time on behalf of Mr. Lee?

A I really am not sure that the word stet ever came
into it.

Q Or not called to trial for one reason or another?

A Yes.

Q And could you tell the Court what reasons those
might have been, to the best of your recollection?

A The suggestion was made that we not try this
case or prosecute Mr. Lee here in the State of
Maryland until the Federal Indictments against
him had been disposed of." [4]

The quoted testimony was not denied. Thus the State's
role in the delay is somewhat mitigated. Nonetheless, on
balance we conclude that the delay from June 12, 1974 to
May 19, 1975, should be attributed to State neglect.

The period from May 19, 1975 to July 21, 1975, following
the hearing and decision upon preliminary motions, clearly
is within reasonable bounds.

In sum, we believe that the critical period of delay is from
June 12, 1974 to May 19, 1975, a period of eleven months and
one week.

### Assertion of the Right

In *Barker v. Wingo, supra,* the Supreme Court declared:

"The defendant's assertion of his speedy trial right,
then, is entitled to strong evidentiary weight in
determining whether the defendant is being
deprived of the right. We emphasize that failure to
assert the right will make it difficult for a
defendant to prove that he was denied a speedy
trial." (at 531-32, [117-18], [2192-93]).

---

4. The trial judge at sentencing in the subject case stated: "The sentence
will be consecutive to any sentence he is now serving." The record shows
that defense counsel immediately prior thereto had said ". . . he is under a
federal sentence." The date of the federal trial and sentence does not appear
in the record.

No attempt to obtain a speedy trial was made by two experienced, competent private counsel for the appellant until May 19, 1975, when they orally moved for dismissal of the indictment upon the ground that the accused had been deprived of his constitutional right to a speedy trial.

This factor in the balancing test weighs heavily against the accused.

## Prejudice

Appellant suggests that *Moore v. Arizona*, 414 U. S. 25, 38 L.Ed.2d 183, 94 S. Ct. 188 (1973), compels a conclusion "that a delay of 19 months is so lengthy as to require a finding of prejudice as a matter of law." (Appellant's brief p. 10). We do not so read the *per curiam* opinion in *Moore*. It is true that *Moore* declared at 27, [186], [190]:

> "Moreover, prejudice to a defendant caused by delay in bringing him to trial is not confined to the possible prejudice to his defense in those proceedings. Inordinate delay,
>
> > 'wholly aside from possible prejudice to a defense on the merits, may "seriously interfere with the defendant's liberty, whether he is free on bail or not, and ... may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends." United States v Marion, 404 US 307, 320, [30 L Ed 2d 468, 92 S Ct 455] (1971). These factors are more serious for some than for others, but they are inevitably present in every case to some extent, for every defendant will either be incarcerated pending trial or on bail subject to substantial restrictions on his liberty.' Barker v. Wingo, **supra, at 537, 33 L Ed 2d 101 (White J., concurring).**
>
> See also id., at 532-533, 33 L Ed 2d 101 (majority opinion).

> Some of these factors may carry quite different weight where a defendant is incarcerated after conviction in another State, but no court should overlook the possible impact pending charges might have on his prospects for parole and meaningful rehabilitation. Strunk v United States, 412 US 434, 439, 37 L Ed. 2d 56, 93 S Ct 2260 (1973)."

That declaration, however, was made in a case wherein the Arizona Supreme Court, without consideration of other factors of the balancing process, summarily had rejected the motion to dismiss the indictment solely because the record did not show an affirmative demonstration of prejudice. In no sense did *Moore* announce a *per se* rule that prejudice will result from the mere passage of time. The Court in *Moore* fully approved the four factors of *Barker v. Wingo, supra*; adopted its language that "these factors have no talismanic qualities"; and remanded the cause to the Arizona Supreme Court "to reassess petitioner's case under the standards mandated by Smith, Barker and Dickey." [5] (*Moore* at 27-28, [186], [190]).

We see in *Moore, supra*, no indication that the prejudice factor controls the balancing equation merely because the record shows that there has been an inordinate delay.

*Barker, supra*, itself destroys such a notion. In that case the delay between arrest and trial was more than five years. Yet, the Supreme Court, counterbalancing that factor, did so upon the ground, *inter alia*, that prejudice was minimal. (at 534, [119], [2194]).

The trial judge conducted a hearing upon the speedy trial issue. The appellant called two witnesses, namely: 1. the assistant State's attorney to whom the case initially had been assigned and 2. one Daniel Robinson.

The manifest purpose sought to be subserved in calling as a witness the originally assigned counsel for the State was to develop that there was a delay attributable to State neglect.

---

5. Smith v. Hooey, 393 U. S. 374, 21 L.Ed.2d 607, 89 S. Ct. 575 (1969); Barker v. Wingo, *supra*; Dickey v. Florida, 398 U. S. 30, 26 L.Ed.2d 26, 90 S. Ct. 1564 (1970).

We have previously stated that we agree that such is the case.

The manifest purpose sought to be subserved in calling Robinson as a witness, on the other hand, was to attempt to show that the delay caused prejudice to the defense. We think his testimony makes a showing directly to the contrary.

Robinson testified that subsequent to June 12, 1974, the door of the home of his consort "was kicked open and a pistol was placed at her head" and "the children was [sic] intimidated and harassed ... and I immediately got panicked because I thought it was all in relation to my being a State's witness against Bernie Lee."

Conceding that he had telephoned the appellant, Robinson thus explained the circumstances leading up to his doing so:

"Q And fearing for your wife's safety and children's safety, you contacted Mr. Lee?

A Mysteriously, Mr. Lee got a phone number to my wife after this.

Q Which is after the door had been kicked in?

A If I am not mistaken, yeah.

Q All right. So, may I ask you whether or not had the door been kicked in, did you have any intention at all of speaking to Mr. Lee?

A It would have been impossible. I didn't know his phone number, I didn't know where he was living at."

The witness's testimony concerning his telephone conversations with Lee included the following:

"Q Money was brought up and the purpose of the money being brought up was what?

A The purpose for the money being brought up was to deal with whether or not he was involved in the alleged kicking open of my wife's door and the threatening of my children to make a deal with them not to mess with them and to make sure that I had got out of the State, that I

wouldn't testify against him provided my family's life was safe.

Q Well, who suggested that money be paid to you so you could leave the jurisdiction and, therefore, not testify in the case?

A Mr. Lee asked me, would it be, Mr. Lee asked me, is there any way we would arrange there, as I wouldn't testify against him and he would give me some help and I would give him some help.

Q What did you say to that?

A At the time I was willing to go along with anything for the safety of my family.

Q In other words, you told him at that time for the security and the money you would leave the jurisdiction and not testify against him?

A Yes, for the security of my family. The money was, would mean transportation to get out of the State."

Robinson also made it plain that he had been available as a witness against appellant as of June 12, 1974. He said:

"Q And you had come up to Baltimore June 12th of 1974 to testify against Mr. Lee?

A Yes, I did.

Q And you were willing to testify at that moment?

A Yes, I were."

Appellant urges that the delay until May 19, 1975 in filing the addendum greatly prejudiced the defense and must be weighed heavily against the State in the balancing process. He argues that the filing of the addendum so long after indictment, thereby doubling his potential sentence liability, caused him to conclude a bargaining arrangement with the State in order to avoid the possibility of an increased penalty.

Speaking of the prejudice factor, the Supreme Court had said:

"A fourth factor is prejudice to the defendant. Prejudice, of course, should be assessed in the light

of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." (*Barker v. Wingo, supra*, at 532, [118], [2193]).

We shall summarize the interests of the appellant under those sub-headings.

### (i) *Pretrial Incarceration*

The record shows that the appellant was released on bail on December 13, 1974 — four days after his arrest. There is no indication that he ever thereafter was incarcerated *for this offense* prior to his conviction and sentence. The record discloses that at some time in the interval between arrest and conviction for the subject offense he was incarcerated for a Federal offense. Such incarceration is beyond the power and control of State authority and manifestly cannot be charged against the State.

### (ii) *Anxiety and Concern of the Accused*

The only evidence of anxiety and concern by the accused is to be found in the testimony of the witness Robinson. That anxiety and concern addressed itself to the elimination of Robinson as a State's witness against the appellant. This is not the anxiety and concern of which *Barker* and *Moore*, both *supra*, speak. There is evidence of none other.

### (iii) *Impairment of the Defense*

There is no suggested failure of memory; no loss of witnesses by the passage of time; no showing that investigation or preparation for trial was hampered by delay. The tardy addendum stands alone as the suggested prejudice.

*The Balancing*

We believe that the delay was untoward. Although there was evidence mitigating State responsibility for that delay we conclude that the factors of delay and the reasons therefor militate against the State in the balancing process.

We consider, however, that the long delay in the assertion of the right to a speedy trial and the absence of any substantial prejudice to the accused plainly tip the scales against the appellant.

Appellant was represented by two experienced, competent attorneys who filed in his behalf an extensive series of both boilerplate and unusual motions. Their failure to include a claim to a speedy trial prior to May 19, 1975 serves as some indicia that it was not desired.

There is other evidence of a lack of desire for a speedy trial. There was no denial that discussions occurred concerning priorities between Federal and State prosecutions whereby it had been suggested that the latter would be deferred to the former. Finally, the testimony of the witness Robinson, brought into the case at the instance of the accused and uncontradicted in the record, demonstrates with crystal clarity that the appellant desired to prevent, rather than to seek, a speedy trial.

The suggested prejudice stemming from the tardy filing of the addendum must be viewed in the light of appellant's failure to assert his claim. No one knew better than the appellant that he previously had been convicted of a narcotics offense. His trial counsel were fully conscious that such a circumstance posed an added potential danger to the accused. Thus, if any prejudice may have resulted by its tardy filing, the apparent defense decision not vigorously to pursue his Sixth Amendment right was at least its co-equal cause.

In any case, such prejudice does not relate to the guilt or innocence of the accused. Nor did it impose an impediment upon a fair and impartial trial.

Balancing all factors, we see no denial of Sixth Amendment rights.

*Judgment affirmed.*